743 F.Supp. 901 (1990)
LINCOLN SAVINGS AND LOAN ASSOCIATION, Plaintiff,
v.
W. Danny WALL, Director, Office of Thrift Supervision, Defendant.
AMERICAN CONTINENTAL CORPORATION, et al., Plaintiffs,
v.
M. Danny WALL, Director, Office of Thrift Supervision, et al., Defendants.
Civ. A. Nos. 89-1318, 89-1323.
United States District Court, District of Columbia.
August 22, 1990.
*902 Leonard Bickwit, Jr., Robert K. Huffman, Kathryn Bucher, Miller & Chevalier, Ch., Washington, D.C., Michael K. Kennedy, John E. Lundin, Gallagher & Kennedy, P.A., Phoenix, Ariz., Charles M. Stern, Ronald L. Fein, James H. Berry, Jr., Paul Baskett, Wyman Bautzer Kuchel & Silbert, Los Angeles, Cal., for plaintiffs.
James P. Murphy, Paul E. Gutermann, Squire, Sanders & Dempsey, Washington, D.C., for defendants.

MEMORANDUM OPINION
SPORKIN, District Judge.
In this consolidated action, plaintiffs American Continental Corporation and Lincoln Savings and Loan Association seek to regain operational control of Lincoln Savings and Loan Association. Plaintiff American Continental Corporation ("ACC") is an Ohio corporation with its principal place of business in Phoenix, Arizona. Plaintiff Lincoln Savings and Loan Association ("Lincoln") is a California corporation chartered as a savings and loan institution by the State of California Department of Savings and Loans. Lincoln is a wholly owned subsidiary of ACC. The deposits in Lincoln were insured by the Federal Savings and Loan Insurance Corporation ("FSLIC"). Defendant Office of Thrift Supervision is the successor agency of the Federal Home Loan Bank Board ("FHLBB" or "Bank Board"). On April 14, 1989, the Bank Board pursuant to its statutory authority appointed a conservator to *903 take over the management of Lincoln. On August 2, 1989, the Bank Board replaced the conservator with a receiver.

I. BACKGROUND
Plaintiffs challenge the decisions of the Bank Board to appoint a conservator and a receiver for Lincoln. Specifically, plaintiffs seek an order requiring the Office of Thrift Supervision, successor to the Bank Board,[1] to remove the conservator that was appointed on April 14, 1989, and the receiver that was appointed on August 2, 1989. The Bank Board possesses the authority to appoint a conservator or a receiver once it makes certain findings. 12 U.S.C. § 1464(d)(6)(A). The decision to appoint a conservator for Lincoln was made after the FHLBB concluded that Lincoln was "in an unsafe and unsound condition to transact business," and that there had been a "substantial dissipation of assets or earnings due to ... violations of law, rules, or regulations, or to any unsafe or unsound ... practices." 12 U.S.C. § 1464(d)(6)(A).[2] Later, these findings coupled with the Board's conclusion that Lincoln was insolvent resulted in the appointment of a receiver.
The relevant statutory provisions empower the Bank Board to make these appointment determinations ex parte and without notice. Id. The statute also authorizes the Bank Board to replace a conservator with a receiver without further notice or hearing. 12 U.S.C. § 1464(d)(6)(D). Once the Bank Board appoints either a conservator or a receiver, the savings and loan association that is adversely affected may seek judicial review of the action. Thus, the association is accorded the right to contest the Bank Board's actions "upon the merits" in a post-deprivation proceeding in the United States District Court for the District of Columbia or the district in which the association *904 has its home office.[3]Id. In initiating this action, plaintiffs have availed themselves of this statutory right to judicial review.
Plaintiffs here contend that they at all times managed and operated Lincoln on a sound financial basis. Plaintiffs allege that defendant was not justified in seeking and obtaining their removal from control of Lincoln which was effectuated by the Bank Board's appointment of a conservator and ultimately a receiver for Lincoln. Plaintiffs claim that the Bank Board's actions were arbitrary and capricious and that these actions were so ill founded that they precipitated Lincoln's severe financial crisis.
Plaintiffs further assert that Lincoln would be solvent and operating today if the Bank Board had not taken the precipitous action of placing Lincoln in a conservatorship and then in receivership. It is defendant's contention that plaintiffs engaged in numerous unsafe and unsound banking practices and that as a result of these and other improper practices there had been a substantial dissipation of the thrift's assets. The Bank Board asserts that it was these practices that led to Lincoln's downfall.
In the post-deprivation hearing conducted before this Court, the Board justified its actions by introducing proof on a number of specific transactions which it claims fully sustain its position.[4] Plaintiffs have countered by alleging that the transactions enumerated were perfectly proper and have introduced expert testimony to demonstrate the accounting treatment afforded these transactions fully conformed with all the professional norms that existed at the time the transactions were effected. Plaintiffs also introduced evidence from their independent auditors which plaintiffs claim fully support the accounting treatment taken.

II. STANDARD OF REVIEW
Here, plaintiffs challenge the decision of the Bank Board, an independent agency of the executive branch, to place Lincoln into a conservatorship and receivership. 12 U.S.C. § 1437. Plaintiffs contend that this Court must review the actions of the Bank Board under a de novo standard. In support of this position, plaintiffs make various statutory and constitutional arguments. Pl.Mem.Dec.Stand. at 4-36. Specifically, plaintiffs place great emphasis upon the language of the statute that affords them the right to initiate this action. The pertinent statutory language provides that once an action challenging the appointment of a conservator or receiver is initiated the "court shall upon the merits dismiss such action or direct the Board to remove such conservator or receiver." 12 U.S.C. 1464(d)(6)(A).[5]
Prior to making a determination that testing of the administrative record was warranted, this Court noted that the purpose of such a hearing would be to determine how good the decision of the Bank Board was, that is "whether it [was], in effect, arbitrary and capricious." Motions Hearing Tr. at 84. Thus, the purpose for conducting an evidentiary hearing was to test the accuracy of the record upon *905 which the Bank Board relied when making its decisions.
Arbitrary and capricious review is often utilized when reviewing the decisions of an administrative action. 5 U.S.C. § 706(2)(A). This standard of review requires judicial deference to the agency's judgment. The Court must consider whether the agency's action was based on a consideration of relevant factors or whether there has been a clear error in judgment. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." Id. Notwithstanding this deference, the agency must "examine the relevant data and articulate a satisfactory explanation for its action including a `rational connection between the facts found and the choice made.'" Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (quoting, Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)). The question of whether an agency has acted in an arbitrary and capricious manner turns on the extent to which the relevant statute restricts the agency's discretion. Kreis v. Secretary of the Air Force, 866 F.2d 1508, 1514 (D.C.Cir.1989). Here, Congress has conferred a great deal of discretion upon the Bank Board. The statute provides that the Board "shall have exclusive power and jurisdiction to appoint a conservator or receiver." 12 U.S.C. 1464(d)(6)(A). The delegation of such authority is consistent with the need for effective regulation of the savings and loan industry. See Woods v. Federal Home Loan Bank Bd., 826 F.2d 1400, 1406-7 (5th Cir.1987), cert. denied, 485 U.S. 959, 108 S.Ct. 1221, 99 L.Ed.2d 422 (1988). This is particularly so where, as here, the accounts of a savings and loan association are insured by the federal government for $100,000 per account. While plaintiff ACC invested some $51 million to purchase Lincoln, the institution's $1 billion in assets came from depositors with federally insured accounts. Thus, by virtue of its insurance of Lincoln accounts, the federal government's interest in Lincoln is many times that of ACC.
Application of arbitrary and capricious review is particularly appropriate where the central issue is whether statutory grounds existed for the appointment of a conservator or receiver at the time the Bank Board acted.[6] As one court has explained,
The issue, regardless of process, becomes whether the Bank Board had a reasonable factual basis for its opinion that one or more of the statutory grounds existed for the appointment of a conservator or receiver. Thus, the ultimate question is whether one or more of the statutory grounds existed at the time of the appointment of the conservator or receiver. After careful consideration, the Court concludes that the exercise of discretion by the Bank Board to appoint a conservator or receiver for a federally-insured association is a determination reviewable under the arbitrary and capricious standard.
Haralson v. Federal Home Loan Bank Bd., 721 F.Supp. 1344, 1353 (D.D.C.1989).
While this Court is convinced that the Bank Board has satisfied the "arbitrary and capricious" standard, the evidence proffered and received during the hearing satisfied each of the other standards that are utilized to review an agency action. In short, this Court finds that the Bank Board was fully justified in taking the actions that it did.[7]

III. DISCUSSION
This is a saga that demonstrates the excesses of a misconceived and misapplied *906 regulatory program along with a group of individuals who were bent on exploiting these excesses, all to the detriment and ultimate demise of Lincoln. It is abundantly clear that Lincoln was in an unsafe and unsound condition to transact business and that plaintiffs did in fact engage in numerous unsafe and unsound banking practices. Accordingly, this Court concludes that the Bank Board acted properly in placing Lincoln first in conservatorship and then in receivership.
Before examining the specific transactions that were the subject of the evidentiary hearing, some background discussion is necessary. It is quite clear that the thrift industry has had a number of problems over the past two decades. In the 1970s, the limits that were placed on both the borrowing and investing activities of thrifts drove a number of savings and loan associations into financial difficulty. First, because of limits on the amount of interest thrifts could pay to investors, savings and loans became noncompetitive with other financial institutions. This resulted in Congress' removing the interest rate ceiling that limited the rate that thrifts could pay to the savings public. Later when Congress learned that the thrifts continued to face severe financial problems, it enacted certain deregulatory measures to provide additional investment opportunities for thrifts, aside from the traditional one of financing the purchase of single family homes. With the number of thrifts facing financial difficulties, Congress believed that it could stave off bailing out the thrift industry of its financial problems by deregulating it and thereby inducing investors to pour private funds into sick thrifts. Congress chose this tack to avoid having to bail out the industry with taxpayers' money. By thus privatizing the S & L problem, Congress thought it had solved the thrift problem with this quick fix. This scheme was devised when industry losses were of an "X" magnitude. As will later be seen by what happened with Lincoln, the privatization gambit failed miserably and today instead of an "X" factor problem, the magnitude of the S & L debacle is probably 5 to 10X and possibly more. Moreover, when the privatization effort failed, the problem then became one that had to be underwritten by taxpayers funds, because at that point there were no other "off the books" solutions available.
Charles Keating, Jr., ("Keating"), the chairman and chief executive officer of ACC, was one of those entrepreneurs who was willing to enter the S & L industry once Congress lessened the regulatory restrictions. Keating had been affiliated with the Lindner Family in Cincinnati, Ohio, for many years, holding several senior positions with American Financial Corporation ("AFC"). It was during his tenure with AFC that Keating gained his first exposure to the S & L industry. AFC was a diversified holding company and it owned approximately three to four savings and loans. Keating remained with AFC until 1976 when Carl Lindner decided to take the corporation private. At that time, Keating decided that he no longer wanted to remain in the organization. In 1976, he arranged with Mr. Lindner to acquire a subsidiary of AFC known as American Continental Homes, this company eventually became American Continental Corporation ("ACC"). Keating moved the company to Phoenix, Arizona and continued to focus its operations on single-family home construction and development. When Keating first took over the company, it was in a loss posture. Over the years, Keating was able to turn it around to where it was moderately successful. In the late 1970s and early 1980s, ACC became very active in building large single-family housing developments in Phoenix and Denver. In addition to the actual construction of homes, ACC started a mortgage company in 1978 to assist home buyers with financing. Building on this experience, in 1981, ACC created a system for packaging and selling groups of single family home mortgages  the investment instrument became known as mortgaged backed securities.
With the passage of the Depository Institutions Deregulation Act of 1980, Pub.L. No. 96-221, 94 Stat. 142 (1980), and the Garn-St. Germaine Depository Institutions Act of 1982, Pub.L. No. 97-320, 96 Stat. *907 1469 (1982),[8] Keating decided to look for a savings and loan association to add to his real estate empire. After analyzing various thrifts that were for sale, Keating decided to see if Lincoln Savings & Loan could be acquired. Keating was attracted to Lincoln for three primary reasons 1) he was impressed with its fine reputation in the industry; 2) the controlling block of Lincoln's stock was owned by one family; and 3) Lincoln was a California chartered savings and loan. According to Keating's testimony, this accumulation of stock in the hands of one family would make Lincoln easier to acquire if the family was interested in selling. The fact that Lincoln had a California State Charter attracted Keating because the California legislature had embarked on a course aimed at deregulating the state's thrift industry in 1982 with the passage of the Nolan Act, 1982 Cal.Stat. c 300.[9] By removing restrictions that had previously been in place, the Nolan Act further broadened the field of direct investments that California savings and loans would be permitted to make.
Although Lincoln had not been formally offered for sale, it had been losing money and the principal owners agreed to entertain an offer from ACC. After a short negotiating period, ACC agreed to acquire Lincoln for $51 million, which represented a premium of some $17 million over the institutions net worth of $34 million. ACC closed the Lincoln acquisition on February 24, 1984. The financing was provided through the issuance and sale in December of 1983 of approximately $55 million in exchangeable preferred stock. This preferred stock issue was underwritten by Drexel, Burnham, Lambert, which had previously underwritten for ACC a high yield debt offering of $125 million in August of 1983.
At the time Lincoln was acquired, it was conducting a traditional savings and loan business. It was largely in the business of lending money to purchasers of single family dwelling units in Southern California. While its business was conservative, it was not thriving financially. At the time of the acquisition, Lincoln had assets of approximately $1 billion and a net worth of $34 million. When ACC took over, it was required to and did obtain approval of both the California and Federal thrift regulators. In the change of control application that ACC filed with the federal regulators prior to its acquisition of Lincoln, it stated that "While it is anticipated that the current officers of the Holding Company and the Institution [Lincoln] will remain upon consummation of the proposed transaction, the Applicant [ACC] intends to augment this management team." Change of Control Application, at 49 (Oct. 13, 1983), Def.Ex. 50. ACC also reaffirmed its commitment to maintain Lincoln's current level of community lending:
In accordance with the provisions of the Community Reinvestment Act of 1977 ("CRA"), no changes are expected in the performance by the Institution [Lincoln] after the proposed acquisition in helping to meet the credit needs of its entire service area or the communities affected by the service area, including low- and moderate-income neighborhoods. It is not expected that there will be any effect of the proposed acquisitions [sic] which will either increase or decrease the availability of credit and savings services in the communities served by the Institution. The Applicant [ACC] does not anticipate at this time an amendment to the CRA statement currently used by the institution which is incorporated by reference herein and enclosed herewith as Exhibit 20.
Id. at 59.
These commitments, however, were short lived. Once ACC was given approval, it deviated from its original plan. Contrary *908 to ACC's representations to the federal regulators that it would retain existing management, the former management team was soon replaced by ACC officials. Although virtually all of Lincoln's pre-acquisition activities had been conducted in the Los Angeles and surrounding areas, after its sale a good portion of Lincoln's business was transferred to Phoenix, Arizona, ACC's home base. Indeed, by 1986, most of Lincoln's operations were conducted out of a newly-constructed Phoenix office, which was located next to ACC corporate offices in downtown Phoenix.
After the acquisition, the mix of Lincoln's business also changed. Lincoln cut back drastically on its single-family mortgages and it began to make all kinds of non-real estate investments. It made direct investments in equity securities and also included "high yield-high risk" bonds in its investment portfolio. It took equity participations in emerging new businesses and made a number of high risk loans to individuals engaged in speculative endeavors. While ACC employed many lawyers, accountants, and other professionals to watch over and handle Lincoln's investments, an inordinate amount of business was originated by Keating himself. This was so even though Keating held no official position with Lincoln. Numerous multi-million dollar deals were negotiated by Keating personally with ACC's staff of professionals left to work out the precise details.
Although when ACC took over Lincoln its expectations were that it would be able to operate in a business environment that would not unduly limit the kinds of investments it could make, this deregulatory environment soon changed. In May 1984, approximately three months after ACC acquired Lincoln, the Bank Board proposed new rules aimed at restricting direct investments by savings and loan institutions. See 49 Fed.Reg. 20719 (May 16, 1984). After notice and comment, a final rule was adopted on January 31, 1985. 50 Fed.Reg. 6928 (Feb. 19, 1985) (hereinafter "Direct Investment Regulation").
The Direct Investment Regulation, among other things, limited the extent to which a federally insured savings and loan could invest in "direct investments," as defined by the regulation. The regulation imposed a ceiling  equal to the greater of 10% of the institution's assets or twice the institutions "regulatory net worth"  on the amount of such investments. The Board adopted this rule because it was convinced that the deregulatory environment that was in existence prior to that time had placed at risk the insured deposits of savings and loan institutions. Edwin Gray, the Bank Board's new Chairman, sided with the old guard conservatives of the S & L industry who believed the new deregulatory environment would be disastrous to the thrift industry and could place in jeopardy the insurance fund that backed individual savings accounts up to $100,000 per account.
Although ACC officials have made much about these regulations and have claimed they adversely impacted Lincoln's financial health, the record does not support their position. What eventually happened to Lincoln had very little to do with the new direct investment regulations.
The Bank Board's case is fairly straightforward. It asserts that Lincoln engaged in a number of imprudent transactions in order to improperly upstream monies to ACC, its parent, which was experiencing financial difficulties.

A. The Tax Sharing Agreement

According to the Board, the first and most egregious unsafe and unsound banking practice was the negotiation and execution of a tax-sharing agreement between Lincoln and its parent, ACC. Under the agreement entered into on March 14, 1986, as implemented, Lincoln was required to remit to ACC on a quarterly basis the amount of tax it would ostensibly owe to the Internal Revenue Service on the basis of its net profits, calculated pursuant to the application of "Generally Accepted Accounting Principles" ("GAAP"). What made this tax agreement advantageous to ACC was that ACC had many millions of *909 dollars of stored-up net operating loss carry forwards. This meant that since ACC owned Lincoln and was responsible for the payment of taxes for the entire ACC consolidated group, including profits generated by Lincoln, it could keep the actual "tax" monies remitted by Lincoln without having to forward them to the Treasury of the United States.
Under the agreement as interpreted and applied by ACC, Lincoln was required to forward to ACC all profits earned pursuant to GAAP even if by application of tax accounting principles Lincoln would have owed essentially no taxes on a stand-alone basis. It is the Board's position that since Lincoln in fact owed no taxes, by Lincoln's remitting payments to ACC, it was in effect making loans to ACC its parent which under Board regulations were unlawful.[10] During the years 1984-1987, Lincoln made "tax payments" of some $94 million to ACC even though it is conceded by ACC that Lincoln under tax accounting principles essentially owed no taxes. Since ACC had net operating loss carry forwards that exceeded this amount, it owed the U.S. Treasury no tax and thus was able to retain the full $94,000,000.
Although ACC concedes that Lincoln on a stand alone basis essentially owed no taxes during this period,[11] it justifies the upstreaming of this $94,000,000 on two bases: First, it states that the tax-sharing agreement was approved by the Board which ACC claims is evidenced by certain correspondence between Sydney Mar, Supervisory Agent of the FHLB-SF, and Andre Neibling, Lincoln's chief executive officer. Plaintiffs point to certain additional correspondence between Mr. Mar and Mark Sauter, ACC's corporate counsel, in support of their position. Second, at oral argument plaintiffs took the position that since the Board had adopted no rules or regulations pertaining to tax sharing agreements, the Board could not after the fact declare tax sharing agreements illegal. According to ACC, what the Board should have done if it did not approve of the way ACC was implementing the tax sharing agreement was issue a cease and desist order. Plaintiffs assert that it was impermissible for the Board to have taken the draconian action it did, which was to remove ACC totally from control of Lincoln.
Plaintiffs' position cannot be sustained on either basis. Let us examine both of plaintiffs' points. First, while there was certain correspondence that was exchanged between the parties, it is abundantly clear from the record that the Board was in no way approving plaintiffs' methodology for determining the timing and amounts of the tax sharing payments.[12] This so-called tax sharing agreement was nothing more than a clever but impermissible way of looting Lincoln by upstreaming funds from Lincoln to ACC. This technique was used largely because the Bank Board would not permit Lincoln to pay any dividends to its parent ACC. Second, plaintiffs' contention that the lack of formal rules or regulations permitted the transfer of $94 million from Lincoln to ACC is tantamount to arguing that theft is licensed in the absence of a rule against the precise method utilized to deprive rightful owners of their property.
The Bank Board is absolutely correct in its analysis of the tax sharing agreement. *910 Under the tax sharing agreement, Lincoln transferred to ACC over $94 million in so-called tax sharing payments when in fact Lincoln on a stand-alone basis essentially owed no taxes. Plaintiffs used the concept of tax sharing as a way of dipping into Lincoln's coffers and taking money which under no circumstances were plaintiffs entitled to have. Although ACC owned 100% of the stock of Lincoln, this did not give ACC license to strip Lincoln of its funds, particularly because the funds upstreamed emanated from the savings of individual investors which were insured up to $100,000 per account by the Federal Government.
It is not clear from the record how plaintiffs came up with this dishonest scheme. The record does show that while the tax sharing agreement was formalized in 1986, it was in fact made retroactive to 1984, the year ACC acquired Lincoln, and payments covering the years 1984, 1985 were immediately made by Lincoln to ACC, even though Lincoln essentially owed no taxes for those years. Plaintiffs make the point that the payments were based upon profits made by Lincoln pursuant to the application of GAAP; but, as every accountant knows, GAAP and tax accounting are not the same. This case clearly proves this point. It is absolutely undisputed that under the application of tax accounting principles essentially no taxes were owed by Lincoln on a stand-alone basis for the years 1984, 1985, 1986, or 1987. There is simply no legal justification for these payments. Moreover, since ACC filed for bankruptcy on April 13, 1989, it is unable to repay Lincoln any part of the $94 million ACC received from Lincoln.
While all tax-sharing agreements between a parent and an insured savings and loan association must be closely scrutinized to assure the S & L is not being disadvantaged by its parent, under no circumstances can such agreements be justified other than on the basis of tax accounting principles. Unless the S & L in fact owes taxes, it is not appropriate for it to remit payments to its parent. The test is a simple one: Would the S & L on a stand-alone basis owe taxes? If it would not, no payments are legally justified. It is inconceivable to this Court how the Board of Directors of a savings and loan institution could agree to remit payments that were not due and owing. The entire Board of Directors, in addition to Keating and the others that controlled and operated Lincoln, must be held strictly accountable for this flat-out dissipation of Lincoln's assets.
The directors of Lincoln completely abdicated their duties to Lincoln by making the so-called tax sharing payments to ACC. This is a clear example of the conflicts that exist where you have a holding company operating a regulated entity that involves the management of large amounts investor funds. Based upon what transpired at Lincoln it would seem that prior to acquiring a savings and loan, holding companies should be required to post a fidelity bond that would assure the honest operation of the institution.
It is thus the finding of this Court that the upstreaming of $94 million from Lincoln to ACC on the basis of a contrived tax sharing agreement was an unsafe and unsound practice that led to a substantial dissipation of Lincoln's assets and by itself fully justified the actions taken by Bank Board first to impose a conservatorship and later to place Lincoln in receivership. This is particularly so since ACC went into bankruptcy and was not able to repay the funds it had misappropriated from Lincoln.[13] That the so-called tax sharing agreement was a pretext for improperly stripping Lincoln of its funds was most clearly demonstrated by ACC's practice of directing Lincoln to remit such payments before any such payments were in fact due under the terms of the agreement itself.[14]
*911 Since essentially no taxes were owed by Lincoln, the payments can only be described as unsecured loans which ACC used for its own purposes and was never in a financial position to repay. An unsecured loan from a savings and loan to its holding company parent is improper. This is particularly so where, as here, the parent corporation spent the money and is not in a financial position to return those funds.
But there is much more skullduggery that has taken place in this case. The tax sharing agreement was merely the mechanism used to permit the impermissible taking that occurred. What the defendant has next alleged and proven is that the plaintiffs engaged in additional unsafe and unsound practices for the purpose of creating bogus profits in order to justify the remittance of monies from Lincoln to ACC under the "tax sharing agreement." The Bank Board presented evidence with respect to a number of specific transactions. The Court finds that the Bank Board is correct in its assessment of these transactions. Defendant's evidence proved beyond question that the main purpose of certain of these transactions was to create paper profits in order to "window dress" the financial statements of Lincoln and its parent ACC and to provide the accounting basis for the upstreaming of funds from Lincoln to ACC.

B. The Wescon Transaction

One of Lincoln's direct investments involved the development of 20,000 acres of land outside Phoenix known as the Estrella Project. The most remote part of the project, the southern half, consists of some 8500 acres and is referred to as Hidden Valley.
The evidence shows that on March 31, 1987, a Lincoln subsidiary sold 1000 acres of raw land in Hidden Valley to a company called West Continental Mortgage and Investment Corporation (Wescon). The terms of the sale involved a cash down payment of $3.5 million, along with a non-recourse note for the balance of $10.5 million for a total sales price of $14 million.
Since Lincoln's pro rata cost of the property sold was only $3 million, it was able to book a gain of $11 million along with $250,000 in accrued interest. In accordance with the "tax sharing agreement," ACC was able to upstream to itself from Lincoln $4.4 million, or 40% of the $11 million gain. This was included in a $4.5 million tax sharing payment made by Lincoln on April 9, 1987, just nine days after the Wescon transaction occurred and some seven weeks earlier than required under the agreement.[15]
Wescon never made a payment against the balance on the outstanding note. Wescon was a company of little means. It had a net worth of only $31,000, and it really had no intention of developing the property. Fernando Acosta, the President of Wescon, was quite blunt in his testimony at the hearing. He stated that his company was acting only as a "straw" for Mr. Garcia, the head of E.C. Garcia & Company.[16] Indeed, when Wescon was being pressed to fulfill its obligations under the transaction, Acosta went to Garcia who agreed to assume Wescon's obligation under the agreement *912 but, like Wescon, made no payments to Lincoln.
It is clear, and this Court finds, that the sole reason for the Wescon transaction was to enable the ACC complex to record an $11 million profit and thus allow ACC to improperly take $4.4 million from Lincoln. ACC justifies its action by stating that certain arcane accounting provisions allowed it to book the $11 million profit. Indeed a great deal of testimony at the trial was devoted to the propriety of the accounting treatment of this and a number of Lincoln's other profit-recording transactions. If ACC, its accountants and experts are correct, that $11 million can be booked as profit from this transaction and that ACC was entitled to extract $4.4 million in cash from Lincoln as a result of the transaction, then the system of accounting that exists in the United States is in a sorry state. Here we have a sham transaction from the start with the identity of the real party in interest being shielded from those who must exercise appropriate oversight of the transaction. Because of the use of a straw buyer the accounting audit trail does not disclose all the salient points associated with the transaction. According to the appraisal obtained by Lincoln, the appraised value of the property was only $9 million, or some $5 million under the designated sales price. The purported buyer was woefully underfinanced and on the basis of its financial statements unable to repay its loan or even service the debt. Since under the terms of the transaction the seller had no recourse against the buyer for the unpaid balance of the debt and since the pay downs on the debt were to be made on a deferred basis, it is clear the seller was not looking for the debt to be repaid in any realistic time frame.
Of particular importance as to this aspect of the transaction was the fact that the actual 25% down payment ($3.5 million) emanated from a loan E.C. Garcia made to Wescon. This meant that Wescon had not invested a single dollar of its own money in the transaction. Moreover, when the entire series of transactions between the Garcia and ACC complex of companies is reviewed, it emerges that in fact the money for the down payment actually emanated from Lincoln itself. The Garcia stable of companies was a heavy borrower from Lincoln. Indeed, at about the time of the Wescon transaction approximately $30 million in loans were being finalized between the Garcia companies and Lincoln. It is also clear from the record that E.C. Garcia was really not interested in buying the Hidden Valley parcel, but was doing so because he did not want to jeopardize a loan of over $20 million he was in the process of obtaining from Lincoln that was going to be used in a transaction that was extremely important to Garcia. It is more than a coincidence that this $20-million loan from Lincoln to Garcia closed on the same day as the $14.5 million sale of the property to Wescon was concluded.
A review of the Wescon transaction demonstrates the booking of an $11 million profit by Lincoln and a forwarding of 40% of that profit (or $4.4 million) to its parent, ACC, under the Tax Sharing Agreement, even though when reviewed in the light most favorable to plaintiffs, Lincoln only received cash of $3.5 million. The bottom line thus shows that Lincoln suffered a cash deficiency of at least $900,000 in the transaction. The cash deficiency rises to $4.4 million, when that transaction is viewed in the light of this Court's finding that Lincoln itself was the indirect source of the $3.5 million Wescon down payment.
Based upon the facts, the Bank Board was absolutely correct in its conclusion that the Wescon transaction amounted to an unsafe and unsound practice and resulted in the dissipation of a substantial amount of Lincoln's assets. This finding is so despite the position taken by Arthur Young and the testimony of the ACC's accounting experts. The Court was quite surprised by these experts' rationalization which supported plaintiffs' position as to the appropriate accounting for this transaction. To be generous to the position expounded by plaintiffs' experts, the Court will attribute the position they took to the abstract application of accounting principles.
*913 What it is hoped the accounting profession will learn from this case is that an accountant must not blindly apply accounting conventions without reviewing the transaction to determine whether it makes any economic sense and without first finding that the transaction is realistic and has economic substance that would justify the booking of the transaction that occurred.[17] Moreover, they should be particularly skeptical of any transaction where the audit trail is woefully lacking and the audited entity has failed to comply with the record keeping requirements established by a federal regulatory body. Of course, the accountants might say they did not have access to the facts that either the Bank Board or the Court had, and it is thus unfair to criticize them for any mistakes they may have made. The fact is the accountants have been aware of the true facts for many months now and have taken no steps to disassociate themselves from the transaction, and indeed have attempted to rationalize before this Court the propriety of the actions they took in allowing the transaction to be booked as it was.

C. The Phillip Gordon Transaction

The next transaction presented by the Bank Board as evidencing unsafe and unsound banking practices involved the purported sale of 445 acres to a group headed by Phillip Gordon the general partner of an entity called Hidden Valley Properties Limited Partnership (HVPLP).
The price for the 445 acres was $6 million to be paid for by a 25% (or $1.5 million) down payment with the balance covered by a non-recourse note of $4.5 million. Since the basis of the property was only $1.6 million, Lincoln chose to recognize the full gain of approximately $4.4 million and in accordance with the tax sharing agreement 40% of the profit, or about $1.7 million, was eventually upstreamed from Lincoln to its parent ACC.[18] The transaction was treated by Lincoln as a straight sale, even though the record makes it absolutely clear that the transaction was part of a land swap between the Gordon interests on the one hand and ACC-Lincoln on the other. On the day before the Gordon transaction closed, Gordon through another of his entities sold certain acreage in Northwest Phoenix to Lincoln's parent ACC for $4.2 million. ACC paid $1.9 million in cash with the balance covered by the assumption of a $2.3 million obligation to an outside lender of a Gordon entity. It is clear from the facts that ACC substantially overpaid for the property since an independent appraisal of the property placed a $2.7 million value on it.
The purpose of this transaction was to provide Gordon with the necessary funds to make the down payment on the Hidden Valley purchase. The Court finds that these transactions were clearly dependent on each other. Gordon would not have bought the Hidden Valley property without ACC's agreement to buy his property. Thus, the Court finds that it was inappropriate for Lincoln to record any profit on the transaction.
Here, the transaction involved an exchange of like property and as such it is inappropriate to recognize a gain. Moreover, even if these two related transactions are analyzed on a stand-alone basis, Lincoln should not have recognized a profit. Under FAS 66[19] where the selling entity furnishes the down payment directly or indirectly, no gain is recognizable. The Court finds that the down payment was furnished *914 by Lincoln's parent, ACC, through its purchase of the Gordon property. To complete the circle, Lincoln was able to reimburse ACC for the down payment it provided to Gordon through the operation of the tax sharing agreement under which approximately $1.8 million was transferred from Lincoln to ACC.
This is another example of ACC officials crafting transactions for the sole purpose of being able to book and record paper profits and upstream monies from Lincoln to ACC. The Court rejects ACC's feeble attempt to attribute a valid business purpose to this set of transactions. The record is clear that the transactions involved a flat-out exchange of property at inflated prices for which no gain should have been recognized and no tax payment made by Lincoln to ACC. The evidence shows that Gordon's sale of his property was structured to provide him with enough cash to make the $1.5 million down payment on the Hidden Valley tract. The two transactions were inextricably linked and the one transaction would not have occurred without the other. Once again, ACC manipulated Lincoln's earnings for its own purpose and to the ultimate financial detriment of Lincoln. Defendant was absolutely correct to label these transactions as unsafe and unsound practices which were responsible for a dissipation of Lincoln's assets. The Court finds that Lincoln was wrong to book the transaction in the way it did.
The Wescon and Gordon "sales" represent only two of ten "creative" transactions involving Hidden Valley parcels. In total, the ten sales resulted in the booking by Lincoln of $82 million in net income or 68% of Lincoln's total 1986-1988 pre-tax income of $120.8 million. Under the tax sharing agreement by applying the 40% tax rate, ACC was able to appropriate to itself from Lincoln almost $33 million in cash from these transactions.
All of the Hidden Valley transactions were fully before the Bank Board when it made its decision to place Lincoln in conservatorship. The facts showed that all of the buyers had little if any of their own money invested in their purchases and that each and every loan was in default. The Bank Board was also aware that even though Lincoln recorded some $82 million in profits and made tax sharing payments to ACC of some $33 million, it had received little if any actual cash from these transactions.
Based on the record the Bank Board was fully justified in finding that ACC and Lincoln had been engaged in numerous unsafe and unsound practices resulting in a substantial dissipation of Lincoln's assets. It was also fully justified in placing a conservator in Lincoln in order to prevent any further dissipation of Lincoln's assets. In fact, it could have done no less in order to properly discharge its responsibilities. The other unsafe and unsound transactions detailed at the hearing before this Court only provided the Board with additional reasons for its action.

D. The Memorex Transaction

Memorex reflects a different kind of overreaching. This transaction essentially involves the taking by ACC from Lincoln of a valuable asset by which ACC was able to realize a profit of $11.5 from the ultimate sale of the asset.
In December, 1986, Lincoln purchased from Drexel Burnham 79,275 shares of Memorex for $1 a share, or $79,275. This transaction was made in conjunction with a high yield debt issue that Drexel Burnham was managing; the cheap stock opportunity was given to Lincoln as a special inducement to participate in the debt issue.
In April 1987, Lincoln sought approval from the FHLB-SF to sell the Memorex stock to ACC for $35.32 per share. Since this transaction involved affiliated parties, regulatory approval was required. While this request was being considered, Lincoln amended its request to change the terms of the transaction from an all cash purchase to one on terms. The FHLB-SF requested that Lincoln provide it with the details of the valuation given to it by Drexel Burnham. Lincoln did not respond to this request and later abandoned its approval application.
In June 1987, a sale of the Memorex stock was arranged with E.C. Garcia & Co. *915 under which Garcia agreed to pay $1 million ($12.75 per share) for the 79,275 shares. As part of this sale, Lincoln retained an option to repurchase the shares for $1.25 million at any time before December 31, 1988. How the sale price of $12.75 a share was arrived at is unclear. This Court is at a loss to understand why Lincoln agreed to a sale for $12.75 a share when Lincoln previously had been advised by Drexel Burnham that the stock was worth $35.32 a share.
Garcia had held the stock for some four months when in October, 1987, right after the stock market crash, E.C. Garcia & Co. sold the stock to ACC for $2 million, or $25.32 a share. As part of the transaction, Lincoln voluntarily waived its rights under its repurchase option. Thus, Lincoln's profit from the transaction was fixed at about $920,000 ($1 million less the purchase price of $79,275). Because of the tax sharing agreement, the actual profit retained by Lincoln was somewhere in the neighborhood of $550,000. Lincoln received no consideration for foregoing its rights under the option. The several proffered explanations given by the plaintiffs for this voluntary act are not credited by the Court.
That the option had substantial value is demonstrated by the what occurred subsequent to ACC's acquisition of the stock. In March and April 1988, ACC disposed of the Memorex shares for $167.77 a share, for a total sum of $13.3 million. ACC's profit from the transaction was $11.3 million. If Lincoln had retained its option, which it relinquished without consideration, it would have been able to book a total profit of some $10 million. Moreover, if Lincoln instead of ACC had repurchased the stock from E.C. Garcia & Co., it would have been able to book several million dollars of additional profits. The Bank Board was absolutely correct in its conclusion that the transaction involved overreaching by ACC of Lincoln and that the transaction was another example of an unsafe and unsound practice that resulted in a dissipation of Lincoln's assets.
The Court does not understand why Lincoln's Board of Directors acquiesced in ACC's purchase of the Memorex stock and relinquished its repurchase option for no consideration. The Board's members clearly were not acting in Lincoln's best interest when they approved the transaction. Moreover, they took no steps to recapture any of the profits realized by ACC when they ultimately learned how Lincoln had been overreached. Here again is another example of abusive conduct of a holding company toward its wholly-owned banking subsidiary. The way ACC acted toward Lincoln in this and the other transactions discussed in this opinion is akin to an adult taking candy from a helpless child. This is precisely the abusive way ACC treated Lincoln.

E. The GOSLP, GUAC, and GOIL Transactions

As part of ACC's plan to show paper profits, on June 30, 1987, the same date Lincoln sold its Memorex shares to Garcia, ACC caused Lincoln to enter into a transaction involving the purported sale to Garcia of one-half of Lincoln's 18.30% interest in General Oriental Securities Limited Partnership ("GOSLP"). GOSLP was an investment oriented partnership created by a group of investors led by Sir James Goldsmith. GOSLP's primary holdings included 1.7 million acres of United States timber land as well as several other assets of the former Crown Zellerbach Company.
The arrangement between Keating and Garcia provided for Lincoln to sell to Garcia one-half of its 18.30% interest in GOSLP for $60 million. Garcia made a $10 million down payment and the balance was covered by a $50 million non-recourse note. In connection with the June, 1987 GOSLP sale to Garcia, Lincoln booked a $38 million profit and was obligated to forward some $15 million to ACC under the tax sharing agreement.
The Court finds that Garcia's $10 million cash payment indirectly came from Lincoln as a result of other transactions between Lincoln and Garcia. Specifically, Lincoln purchased from Garcia a parcel of land for $7 million and certain notes receivable for $37 million. Garcia had purchased the land *916 for only $4 million and Lincoln's $7 million payment was at Garcia's asking price. The notes, which totaled $37 million, were non-recourse and were sold to Lincoln at par. All the notes are now in default. Lincoln received only $1.3 million in principal payments against these notes.
In October, 1987, at the same time ACC arranged to repurchase the Memorex shares from Garcia, Lincoln obtained an option from Garcia for $2 million to buy back the GOSLP interest for an additional $7 million (total $9 million) and cancellation of the $50 million GOSLP note upon exercise of the option. In early 1988, ACC realized it would have difficulty sustaining its ability to report a $38 million gain on the GOSLP transaction and retain the $15 million in tax sharing payments it received from Lincoln because of the reversal of the GOSLP transaction with Garcia.
To avoid having to reverse the transaction, Lincoln sold its option to repurchase GOSLP to Lanier, an affiliate of the Saudi European Bank, an entity in which Lincoln held a 10% interest. The purchase price of the option was $2.25 million or $250,000 more than Lincoln had paid Garcia for it. As a result of the sale of the option, there was no reversal of the profit generated by the sale of GOSLP to Garcia in June 1987 or the $15 million tax sharing payment.
The Bank Board in its post trial brief observed: "For a profit of $250,000 Lincoln lost $15,000,000 in reversed tax sharing payments." Def.Br. at 77. This is a fair assessment of the consequences of this complex set of circumstances concerning the GOSLP property.
The story gets even more complicated. In September, 1988, Lanier returned the GOSLP interest to Lincoln. Shortly thereafter Lincoln exchanged its GOSLP interest, along with certain other assets which were essentially in an entity known as Grand Union Acquisition Corporation ("GUAC"), for a 20% stock interest in another entity organized by Sir James Goldsmith called General Oriental Investments Limited ("GOIL"). Sir James Goldsmith controlled the remaining 80% of GOIL. The terms of the repurchase of the GOSLP interest from Lanier lead this Court to the conclusion that Keating was engaged in a series of "parking" transactions. The reason the interest was parked with Lanier was to bail Lincoln and ACC out of certain accounting problems they had when Lincoln repurchased the GOSLP interest from Garcia in the same year that Lincoln had sold the interest to Garcia and recognized a $38 million profit.
It is this Court's finding that the transaction with Lanier was spurious from its inception. This is largely proven by the terms of Lincoln's reacquisition of GOSLP from Lanier. The transaction was not at market price. Instead Lincoln re-acquired the interest at Lanier's acquisition cost plus a "fixed fee." According to Lincoln's own evaluation of GOSLP at the time of the transaction, the GOSLP interest was worth $15 million more than Lincoln's cost of reacquisition. Thus it is quite clear that Lanier would not have abandoned the opportunity to make a $15 million profit unless it was party to a parking transaction on terms that had already been fixed. While ACC denies the existence of a parking transaction, this Court simply does not find the denial by ACC's officials in this regard to be credible in any respect. Their testimony is also belied by other parking transactions that ACC and Lincoln effectuated. One of the most blatant involved the sale to and repurchase from Centrust, a Florida savings and loan association, of an interest in GUAC common stock.
Lincoln, through one of its subsidiaries, had acquired an interest in GUAC in March 1988. At that time, Lincoln purchased $12.5 million of GUAC common stock, which represented a 25% interest in GUAC. Simultaneously, Lincoln also acquired $37.5 million of GUAC preferred stock. In June 1988, just two months after its initial acquisition of GUAC, Lincoln arranged a transaction in which Centrust purchased a 62.5% profit sharing interest in Lincoln's GUAC common stock. On June 17, 1988, Centrust paid Lincoln $30 million to acquire this profit participation. It was agreed that if the GUAC common stock was sold within one-year Centrust's profit would be capped *917 at $6 million.[20] In connection with the sale of GUAC to Centrust, Lincoln booked a $24.6 million gain which resulted in approximately $10 million in cash being upstreamed from Lincoln to ACC.[21]
ACC was in dire need of obtaining $10 million because of an agreement with the Bank Board to infuse an additional $10 million into Lincoln.[22] Thus, Lincoln was actually the source of its own $10 million cash infusion that ACC was compelled to make by its agreement with the Bank Board. This surfaced during the testimony of Janice Vincent of Arthur Young who learned of these facts from Jack Atchison, a former colleague of hers at Arthur Young who at the time of their conversation had become a top official at Lincoln.[23] According to Vincent, Atchison, who invoked his Fifth Amendment rights when he declined to testify at the hearing, told her that ACC was "required pursuant to the MOU to invest an additional $10 million in Lincoln by June 30. Due to a tax sharing agreement, the gain on the Centrust profit participation transaction caused a $10+ million tax provision which can be paid up to the parent and fund that additional investment." Def.Ex. 126.
The Centrust acquisition of GUAC turned out to be another parking transaction. In September 1988, Lincoln reacquired GUAC from Centrust for $36 million, which resulted in Centrust realizing a profit of $6 million for holding the GUAC interest for only 3-4 months. Thus, Lincoln was not only out the $10 million tax sharing payment, but also had to pay from its treasury some $6 million as a "parking fee" to Centrust for holding GUAC for this brief period. Shortly, after the GUAC common stock was reacquired it along with the GUAC preferred stock was packaged with Lincoln's GOSLP interest and approximately $8.75 million in cash to obtain a 20% interest in GOIL.
Ms. Vincent provided some rather interesting testimony on the GOIL transaction. As part of Lincoln's acquisition of GOIL common stock it was Keating's plan to book a profit of some $59 million from the *918 transaction. This was so even though Lincoln would have received no cash when it turned in its GUAC and GOSLP interests along with $8.75 million for the 20% interest in GOIL. Ms. Vincent testified that Arthur Young did not believe any profit should be recorded. She testified that Keating was indeed desperate in his desire to record a profit from the transaction. He told Vincent that if Lincoln was not able to record the profit Lincoln's parent ACC would probably have to file for bankruptcy.[24] But Arthur Young stood firm and refused to allow Lincoln to show a profit on this transaction.[25] Later the SEC backed Arthur Young's position and Keating failed in his attempt to "window dress" Lincoln's and ACC's financial statements in this instance.[26] This transaction eloquently demonstrates that ACC officials were bent on manipulating ACC's and Lincoln's financial statements all for the purpose of showing paper profits regardless of the economic realities that underscored the transaction.
The GOSLP, GUAC, and GOIL transactions are additional examples of unsafe and unsound transactions leading to a dissipation of Lincoln's assets. These were transactions that were structured to disguise the true facts. Lincoln was required to lay out millions of dollars for the sole purpose of recording paper profits and upstreaming monies to its parent ACC. Here are additional instances where Lincoln's assets were dissipated without any tangible benefit being derived by Lincoln from the transactions. Indeed, all of the benefits associated with the transactions were taken by ACC.[27]

*919 F. Lincoln's Insolvency

On August 2, 1990, the Bank Board decided to replace the conservator that had been appointed for Lincoln with a receiver. The decision to appoint a receiver was made after the Bank Board concluded that Lincoln was insolvent by approximately $631 million as of June 30, 1989. The relevant statutory provision provides that a savings and loan association is insolvent when "the assets of the association are less than its obligations to its creditors and others, including its members." 12 U.S.C. § 1464(d)(6)(A)(i).
Upon the appointment of the conservator on April 14, 1989, the conservator initiated a process of reviewing Lincoln's financial condition. As part of this review an appraisal was made of most of Lincoln's assets. Based upon the testimony produced by the Bank Board and the documents introduced, this Court finds that Lincoln was in fact insolvent as of the date the receiver was appointed. While plaintiffs made some valid points as to the accuracy of certain of the values submitted by the Bank Board's appraisers, Lincoln's deficit was so massive that the few inconsistencies demonstrated would not have made a material difference as to the ultimate amount of the insolvency.

IV. CONCLUSIONS OF LAW
Based upon the above findings, it is this Court's conclusions of law that the Bank Board acted appropriately in all respects in it first placing Lincoln in conservatorship and then in receivership. The Bank Board's actions of April 14, 1989, and August 2, 1989, are in all respects supported by substantial evidence. None of the Bank Board's material findings were arbitrary or capricious and accordingly the Court will enter judgment in favor of the Bank Board and dismiss plaintiffs' action in its entirety. Based upon the facts found by this Court, to return Lincoln to ACC, a defunct entity, would be the height of irresponsibility.

-----------
Because of the interests at stake in this case and plaintiffs' allegations of an impermissible constitutional taking of plaintiffs' property, the Court permitted the parties the widest latitude to develop a full and complete record. What has emerged is not a pretty picture. It is abundantly clear that ACC's officials abused their positions with respect to Lincoln. Bluntly speaking, their actions amounted to a looting of Lincoln. This was not done crudely. Indeed, it was done with a great deal of sophistication. The transactions were all made to have an aura of legality about them. They even entered into a so-called formal tax sharing agreement in order to claim they had the approval of the regulatory authorities for this phase of their illicit activities. While it is clear ACC overreached in its relationship with Lincoln, it is not discernible why ACC's officials acted as they did.[28]
There are other unanswered questions presented by this case. Keating testified *920 that he was so bent on doing the "right thing" that he surrounded himself with literally scores of accountants and lawyers to make sure all the transactions were legal. The questions that must be asked are:
Where were these professionals, a number of whom are now asserting their rights under the Fifth Amendment, when these clearly improper transactions were being consummated?
Why didn't any of them speak up or disassociate themselves from the transactions?
Where also were the outside accountants and attorneys when these transactions were effectuated?
What is difficult to understand is that with all the professional talent involved (both accounting and legal), why at least one professional would not have blown the whistle to stop the overreaching that took place in this case.[29]
While we in this nation have been trying to place blame for the savings and loan crisis on the various governmental participants in the crisis and on the government's fostering of deregulation within the thrift industry, this Court believes far too little scrutiny has been focused on the private sector.[30] We are the world's greatest example of the success of the private enterprise system. It would thus seem that the private sector ought to be able to put in place a system that would prevent the kinds of excesses that took place in Lincoln from recurring. Here it is clear the private sector was not willing to cooperate with the public oversight regulators. Indeed, the private sector at times impeded the regulatory authorities from discharging their duties. All too often Keating and those individuals working with him adopted strategies to thwart and frustrate the regulatory process.[31] Such tactics included making it difficult for the Board's examiners to *921 obtain records[32] and threats to institute lawsuits.[33] These tactics were somewhat successful in that through their intimidating effect they delayed the Board from taking prompt action.
Perhaps the attitude of the private sector in its interface with regulatory authorities is summed up by the statement made by one of Lincoln's accountants when it resigned from the Lincoln audit:
___ confirmed to the Registrant that ___'s resignation was not the result of any concern by ___ with the Registrant's operations, recordkeeping, books and records, management cooperation, or asset/liability management; ___ expressed full confidence in the Registrant's financial disclosure. ___ advised the Registrant that the resignation was a result of ___'s concern over potential liability in representing certain savings and loan associations in view of the very litigious environment controlled to a large degree by regulators. In particular, ___ cited the regulators' criticism over thrift institutions' rate of growth and asset mix (although consistent with applicable statutes and regulations), and ___'s concern over the considerable publicity generated by the FHLBB's and its Chairman, Mr. Gray's, disagreements with the policies of the Registrant.
SEC Form 8-K (Oct. 1, 1986), Pl.Ex. 919.
It seems that the accounting firm was more concerned with attempts of conscientious regulators to deal with the savings and loans industry's severe crisis than the "creative accounting" of its "high flying" client.
One of the great attributes of this nation is it learns from its mistakes. It is clear that this case should provide all of us with a very valuable learning experience. If the lessons are learned well, we will have gone a long way in preventing these abusive activities from recurring in the future.[34]
An order will follow.

ORDER
Upon consideration of plaintiffs' complaint, the legal memoranda submitted by the parties, the evidence received at the evidentiary hearing, the arguments of counsel, and in accordance with this Court's memorandum opinion of this date, it is this 22nd day of August, 1990, hereby
ORDERED that judgment is GRANTED in favor of the defendant and that plaintiffs' action is dismissed in all respects.
NOTES
[1] On August 9, 1989, President George Bush signed into law the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101-73, 103 Stat. 355. Section 401 of FIRREA abolished the Federal Savings and Loan Insurance Corporation ("FSLIC") and the Bank Board and replaced them with the Resolution Trust Corporation ("RTC") and the Office of Thrift Supervision ("OTS"). The OTS did not take over the responsibilities of the Bank Board until sixty (60) days after enactment of the statute. Section 301 of FIRREA created the OTS in the Department of Treasury and transferred to the Director of OTS most of the powers formerly vested in the Bank Board. Section 401(g)(2)(A) also provides that "[n]o action or other proceeding commenced by or against the Federal Home Loan Bank Board, ... shall abate by reason of the enactment of this Act, except that the appropriate successor to the interests of such Board shall be substituted for the Board ... as a party to any such action or proceeding." Thus, OTS is substituted as the defendant in this action. Additionally, since all the Board actions at issue in this controversy occurred prior to the enactment of FIRREA, the pertinent statutory and regulatory provisions are those that were in effect prior to August 9, 1989.
[2] 12 U.S.C. 1464(d)(6)(A) provides:

The grounds for the appointment of a conservator or receiver for an association shall be one or more of the following: (i) insolvency in that the assets of the association are less than its obligations to its creditors and others, including its members; (ii) substantial dissipation of assets or earnings due to any violation or violations of law, rules, or regulations, or to any unsafe or unsound practice or practices; (iii) an unsafe or unsound condition to transact business; (iv) willful violation of a cease-and-desist order which has become final; (v) concealment of books, papers, records, or assets of the association or refusal to submit books, papers, records, or affairs of the association for inspection to any examiner or to any lawful agent of the Board. The Board shall have exclusive power and jurisdiction to appoint a conservator or receiver. If, in the opinion of the Board, a ground for the appointment of conservator or receiver as herein provided exists, the Board is authorized to appoint ex parte and without notice a conservator or receiver for the association. In the event of such appointment, the association may within thirty days thereafter, bring an action in the United States district court for the judicial district in which the home office of such association is located, or in the United States District Court for the District of Columbia, for an order requiring the Board to remove such conservator or receiver, and the court shall upon the merits dismiss such action or direct the Board to remove such conservator or receiver. Upon the commencement of such an action, the court having jurisdiction of any other action or proceeding authorized under this subsection to which the association is a party shall stay such action or proceeding during the pendency of the action for removal of the conservator or receiver.
[3] This Court quite early in these proceedings concluded that the Fifth Amendment of the Constitution and the statutory language "upon the merits" require the reviewing Court to undertake a level of inquiry beyond a simple review of the administrative record. To that end, plaintiffs were permitted to challenge the accuracy of the administrative record. A wide ranging evidentiary hearing was held during which oral testimony and documentary evidence were received by the Court. This evidentiary hearing consumed some twenty-nine (29) days.
[4] Each of these transactions is discussed in detail later in this opinion.
[5] Plaintiffs advanced similar arguments before this Court during preliminary hearings to determine whether testimony and other evidence beyond the administrative record would be received. This Court agreed with plaintiffs that some limited testing of the administrative record was warranted particularly in light of the fact that plaintiffs were not provided a formal opportunity to comment on the record before the Bank Board. See Motions Hearing Tr. 78-91; see also supra note 3.
[6] Plaintiffs' counsel conceded this point during the motions hearing conducted in this case. He stated, "What's relevant is whether grounds [for appointment] existed on April 14 and August 2." Motions Hearing Tr. at 65 (Nov. 8, 1989).
[7] As the discussion below demonstrates, application of the de novo standard that plaintiffs advocate would not lead this Court to vary its ultimate conclusions.
[8] Prior to the passage of these statutes, savings and loan associations were quite restricted in nature and type of investments that they were permitted to make. Such institutions were not allowed to make what has been termed "direct investments"  investments made by a savings and loan association directly and not through the extension of credit to a third-party borrower. This would include investments in stocks, bonds, and real estate.
[9] The effective date of the Nolan Act was January 1, 1983.
[10] See 12 C.F.R. § 584.3 (1986), Def.Ex. 20. Section 584.3 restricts the extent to which an insured savings and loan association can enter into transactions with its affiliated entities. Under this provision, certain transactions are prohibited unless approval is obtained from regulatory officials.
[11] Lincoln continued to be responsible for taxes to the extent it was subject to the alternative minimum tax requirements of the Internal Revenue Code, which in this case were minimal.
[12] It is truly unfortunate that the key individuals from the Bank Board and ACC who negotiated and signed the correspondence in question did not appear and testify at the hearing. General Counsel of ACC, Mark Sauter, and Lincoln's CEO, Andre Neibling, declined to testify each asserting his Fifth Amendment rights. Sydney Mar of the Bank Board simply was not called as a witness. Instead, Sonja Rodriguez was produced as a witness. While the Court found her a credible witness and credits her testimony that the Board's approval was of a tax sharing agreement based on actual tax liability, it is clear that Mr. Mar could have shed some additional light on the issue.
[13] ACC filed for bankruptcy on April 13, 1989.
[14] Andrew Ligget, ACC's Chief Financial Officer, directed Lincoln to make tax sharing payments to ACC at times prior to when these payments were due under the terms of the agreement. The extent to which Lincoln was used to achieve ACC ends is most clearing illustrated by the following inter-office memorandum between ACC and Lincoln:

Can we accelerate Lincoln's 1st Qtr-1987 tax sharing payment to AMCC?
Based on current projections (including 600K reversal of January tax benefit) Lincoln's 1st Qtr-1987 tax provision totals $5,157,000.
Let's have Lincoln remit $4,500,000 to AMCC ASAP to help offset the 10¾ debt retirement. Can you two work out the wire transfer?
Thanks in advance.
Memorandum from Andrew Ligget to Kathy Rubino/Lynn Borushko (April 8, 1987), Def.Ex. 497; see also Memorandum from Andrew Ligget to Kathy Rubino/Lynn Borushko (June 30, 1987) (directing acceleration of the 2nd Quarter 1987 tax sharing payment), Def.Ex. 137.
[15] ACC officials, including ACC's Chief Financial Officer Andrew Ligget, were unable to offer any explanation or justification for this pre-payment of taxes. Nor did they provide any explanation for the accelerated "tax sharing payments" that ACC officials directed Lincoln to make at other times. See supra pp. 910-11, note 14.
[16] The Court did not have the benefit of hearing directly from Mr. Garcia, because he asserted his Fifth Amendment right not to testify. However, a transcript of Mr. Garcia's testimony from a deposition conducted by the Securities and Exchange Commission ("SEC") was introduced into the record. Pl.Ex. 646.
[17] Accountants must be particularly skeptical where a transaction has little or no economic substance. This is so despite the fact that the transaction might technically meet GAAP standards. In a paper prepared by Touche Ross & Company in 1975 the following poignant statement appears: "The goals of accounting are to measure, record and communicate economic reality. In the long run, these goals are necessities  both for accounting and for society. Can behavior be economically rational if not grounded on economic reality."
[18] Lincoln also took into income for the year ending December 30, 1988, $422,600 of accrued interest, even though the Gordon Partnership defaulted on the loan without ever having made a single payment on its non-recourse loan.
[19] Financial Accounting Standard 66, adopted by the Financial Accounting Standards Board, establishes the guidelines for recognizing profit or loss on real estate transactions. Pl.Ex. 642.
[20] It is interesting to note that on June 15, 1988, just two days before the GUAC transaction, Centrust and Lincoln entered into another transaction wherein Lincoln paid Centrust approximately $20.5 million to acquire a block of Playtex common stock that was held by Centrust. If the stock was sold within one year, Lincoln's potential profit was capped at approximately $4 million.
[21] See Def.Ex. 126.
[22] This agreement, which was entered on May 20, 1988 between ACC/Lincoln and the Bank Board/FSLIC, was known as the "Memorandum of Understanding" ("MOU"). The agreement was the result of negotiations between attorneys for Lincoln/ACC and regulatory officials. To understand the terms of this agreement it is necessary to briefly review Lincoln's regulatory history. The Federal Home Loan Bank of San Francisco (FHLB-SF) conducted an examination of Lincoln in 1986 and 1987 which resulted in a report being issued on April 20, 1987. Lincoln took exception with the findings of this examination and believed that its financial condition was not fairly portrayed. The MOU was an attempt to resolve the disputes that existed between Lincoln and the FHLB-SF. The terms of the MOU provided, among other things, that a new examination of Lincoln would be conducted under the supervision of the Bank Board in Washington, DC; that no examiners from the FHLB-SF would be used when conducting the examination; that Lincoln's capital would be increased, the risk profile of its assets decreased, and its underwriting procedures enhanced. See Memorandum of Understanding (May 20, 1988), Pl.Ex. 545.

On the same day the MOU agreement was executed, Lincoln/ACC and the Bank Board/FSLIC entered into another agreement that was incorporated by reference into the MOU. Among other things, this second agreement required, ACC to acquire $10 million of Lincoln preferred stock by October 1, 1988. This acquisition was to be made in cash and was to qualify as a contribution to Lincoln's regulatory capital. See Agreement (May 20, 1988), Pl.Ex. 858.
[23] Atchison, who was in charge of the Arthur Young audit of Lincoln, left Arthur Young to assume a high paying position with Lincoln. This certainly raises questions about Arthur Young's independence. Here a person in charge of the Lincoln audit resigned from the accounting firm and immediately became an employee of Lincoln. This practice of "changing sides" should certainly be examined by the accounting profession's standard setting authorities as to the impact such a practice has on an accountant's independence. It would seem that some "cooling off period" perhaps, one to two years, would not be unreasonable before a senior official on an audit can be employed by the client.
[24] With respect to the GOIL transaction Ms. Vincent testified in reference to conversation she had with Keating, "He said he thought he would have to declare bankruptcy if we did not recognize this transaction.... He said the transaction was extremely material to their company, to their financial condition and results of operation." Vincent Testimony, Tr. at 3864.
[25] While there are few heroes in this saga, Ms. Vincent must be commended for standing firm on the proper accounting for this transaction. Indeed, she maintained her position despite attempts made by Keating to have her removed from the audit.
[26] On October 13, 1988, Arthur Young agreed with ACC to terminate its engagement as ACC's outside auditor. While no specific reason for the termination was given, the 8-K report reflects that there was a material disagreement as to the recognition of gain with respect to the GOIL transaction. As was stated:

.. AY and Registrant ... have been engaged in discussions regarding the income recognition for a specific transaction involving the nonmonetary exchange of assets. In September 1988, Registrant exchanged its equity investment in a third party [GUAC] ..., a partnership investment [GOSLP] and cash for a common stock investment in another corporation. Registrant [ACC] believes the transaction, which must be reported as income for tax purposes, is a nonmonetary exchange of dissimilar assets on which material gain must be recognized in its financial statements in September 1988.
This corporation [GOIL], whose common stock was received by registrant in the exchange, had interests in the third party and the partnership before the transaction. Based on the financial data of the corporation presented to AY by the Registrant and other information provided by the Registrant, AY believes that such interests constitute a material portion of such corporation's assets both before and after the exchange. AY had given the Registrant its conclusion as to the appropriate accounting; the disagreement between the parties had not been resolved between the parties at the time the relationship between AY and Registrant was mutually terminated.
AY believes that, to the extent Registrant has a continuing interest in the third party and the partnership through the direct ownership of interests prior to the transaction and indirectly through its ownership in the corporation subsequent the transaction, the transaction is an exchange of similar assets which is not essentially the culmination of an earning process. Thus, the accounting should be based on the recorded amount of the nonmonetary assets relinquished adjusted for the noncontinuing interests. AY believes that any gain to be recognized in September 1988 is minimal, and that any further gain on the exchange which might be recognized at a later date is contingent on future events.
SEC Form 8-K (Oct. 28, 1988), Def.Ex. 166.
[27] The true value of GOIL remains to be seen. Keating testified Lincoln's 28,600,000 shares of GOIL constitute a valuable asset. His testimony was supported by an appraisal from Merrill Lynch which placed a value of between $11.30 and $12.40 per share on the GOIL stock. See Merrill Lynch Appraisal Letter of October 17, 1988, Pl.Ex. 554. Thus, according to the Merrill Lynch report, the total value of the GOIL stock is between approximately $323 million and $355 million. Whatever GOIL is worth is somewhat beside the point. Its value can only be accurately ascertained when it is finally sold. The booking of a profit by Lincoln based upon the acquisition of GOIL through an exchange of GOSLP, GUAC common and preferred stock, and $8.75 million in cash only contributed to a further dissipation of Lincoln's assets. Because Keating elected to recognize a gain on this exchange, Lincoln's potential tax liability was significant. As far as the record shows, no tax payment has as yet been made on this transaction because of the revocation of the tax sharing agreement and the collapse of ACC and Lincoln prior to the filing date for the taxable year in question.

It is highly doubtful that the GOIL stock is worth the amount ascribed to it. This is for two reasons. First, the GOIL shares are thinly traded and only have a market on two exchanges  the Vancouver and London Stock Exchanges. Although GOIL has substantial holdings in the United States, GOIL stock is not traded in the United States. Second, if the shares carried the value as stated Lincoln certainly would have sold them because $323 million would have gone a long way in restoring Lincoln to a solvent position.
[28] Keating provided a partial answer when he discussed the importance of the tax sharing agreement to ACC. He testified as follows:

First of all, we bought Lincoln and ACC the holding company. When I was unable to merge the two or however you'd say it, I still had the debt from the purchase in ACC. It wasn't specifically in my mind that these tax payments would cover that debt, but I had operational and debt situation [sic] in ACC that required servicing and just where the money was and where we got it was just a part of doing business. It wasn't related to the weakness of Lincoln.
Keating Testimony, Tr. at 1054.
[29] This case also demonstrates the tremendous conflicts that exist when a holding company operates a federally insured banking institution. If there is to be any reform in this area, the holding company problem must be addressed. A requirement that the banking subsidiary have a totally independent board of directors not unacceptable to the banking authorities is one possible solution. Another possible reform measure would be to ban holding companies or at least to require the holding company to be bonded so that there would be funds available to be returned to the banking subsidiary when overreaching by the holding company has occurred.
[30] It must be remembered that the purpose of deregulation is to foster the ability of private organizations to compete and not to provide a license to steal.
[31] The Bank Board has received criticism for its failure to take prompt action against Lincoln and its general lack of appropriate oversight of Lincoln. While the FHLB-SF recommended fairly early in the game that Lincoln be placed in conservatorship/receivership, its recommendation was rejected by the Bank Board in Washington. See Recommendation and Statement of Supervisory Concerns (May 1, 1987), Def.Ex. 136. The case for receivership that FHLB-SF had built was essentially a technical case consisting of allegations that Lincoln's record keeping was deficient. The FHLB-SF did not investigate to any great extent any specific substantive transactions. For example, FHLB-SF completely overlooked the tax sharing agreement and the upstreaming of $94 million from Lincoln to ACC. Indeed, it was FHLB-SF that had actually approved the tax sharing agreement but did not follow through in its examination to see if the agreement was being carried out in accordance with its understanding of the agreement.

The case finally developed by the Washington office was well investigated and properly documented. The Bank Board's investigation revealed serious substantive violations. Once the facts had been gathered and reviewed, the Board proceeded with its conservatorship action. The investigation conducted by the Washington office appears to have been performed in a highly competent fashion. If any fault lies with the Washington office's conduct, it was in acceding to the threats of legal action by ACC which caused it to enter into an unwise agreement with ACC under which it formally agreed to wipe the slate clean with respect to Lincoln's past violative conduct, to transfer jurisdiction over Lincoln from San Francisco to Washington, to reject and ignore completely the examination made by the FHLB-SF, to conduct an entirely new examination of Lincoln from scratch, and to cut off all communication with FHLB-SF pending completion of the new examination. See supra note 22 (discussing the MOU and related agreements).
The FHLB action in this respect is inexplicable and clearly inappropriate. No federal agency should ever cede any of its authority to a private organization because of baseless threats. To the extent private counsel was enlisted to write menacing letters and prepare ill founded law suits, it should self examine its client representation particularly where its acts can have such a devastating impact on the public by impeding or unduly delaying appropriate government action. Of course, there is nothing in the record that would in any way suggest counsel was acting in concert with plaintiffs' illicit activities. Perhaps what is necessary is some due diligence on the part of counsel to assure that the steps it has been asked to take are not designed to frustrate the public interest.
[32] At one point, Lincoln insisted that all requests made by Bank Board examiners be routed through the office of Lincoln's New York based outside counsel. Obviously, this practice is unacceptable where the examiners have the right to have immediate on site inspection of a regulated entities records.
[33] This is an area that Congress should address in its consideration of reform measures. Regulatory officials, acting in good faith and not corruptly, and regulatory agencies themselves should be immune from legal actions that seek to prevent these individuals and agencies from discharging their official duties or subjecting them to money damages. Private lawsuits against agency employees that can jeopardize their financial assets and reputations can be very intimidating to honest and dedicated public servants.
[34] While at times the Court has been critical of certain of the professionals who have been involved in this case, this criticism does not apply to the attorneys who have participated in the instant litigation. They have acted in the highest traditions of the profession and have been very helpful to the Court by presenting their legal positions in a competent manner. They are to be commended for a job well done.